United States District Court
Southern District of Texas
**ENTERED**

January 26, 2018

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARY BETH CARSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-199 |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 10) and Defendant's Cross-Motion for Summary Judgment (Doc. 7). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under

---

[1] Carolyn W. Colvin was the Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 5, Ord. Dated Apr. 28, 2017.

Title II of the Social Security Act ("Act").

## A. __Medical History__

Plaintiff was born on May 26, 1961, and was fifty-one years old on the alleged disability onset date of May 14, 2013.[3] Plaintiff worked as a court reporter for many years up to May 14, 2013.[4] The medical records generally support a history of treatment for psychiatric disorders and diabetes mellitus ("diabetes").[5]

### 1. Psychiatric Disorders

Plaintiff began treatment with Edward Fallick, D.O., ("Dr. Fallick") in 2000 for psychiatric disorders.[6] At an appointment four months prior to the alleged onset date, Plaintiff reported that she was feeling much better since starting Abilify,[7] stating that it "[r]eally changed [her] life" and that her mood was a lot lighter and she was "less snappish."[8] During the relevant time, Plaintiff continued to see Dr. Fallick for medication management

---

[3]   See Tr. of the Admin. Proceedings ("Tr.") 237, 352, 357, 388, 411.

[4]   See Tr. 384, 393.

[5]   See Tr. 21-29, 37-202, 449-592, 597-612, 629-964, 971-1013, 1021-1176.  The court has reviewed the entire medical record but limits its discussion to the pertinent records concerning mental health and diabetes, the evidence on which Plaintiff bases her challenges to the Commissioner's determination.

[6]   See Tr. 395, 420, 672-761.

[7]   Abilify is an antipsychotic drug used to treat mood disorders, as well as schizophrenia, Tourette's disorder, and autism.  See Abilify, WebMD (July 2017), www.webmd.com/drugs/2/drug-64439/abilify-oral/details.

[8]   Tr. 679.

until January 2015.[9]  At that last appointment, Plaintiff stated that she was "[d]oing fairly well (all things considered)."[10] Although Plaintiff's mood reports varied from increased depression to improved, the mental status examination results were consistently within normal limits, and the Global Assessment of Functioning[11] ("GAF") score, when included, remained at sixty, a score at the highest functioning end of moderate symptoms.[12]  Dr. Fallick diagnosed Plaintiff with mood disorder, not otherwise specified, and regularly adjusted Plaintiff's medications based on Plaintiff's reports of the effects on her mood.[13]  None of Dr. Fallick's treatment notes from this time period reflected a diagnosis of bipolar disorder or attention-deficit hyperactivity disorder ("ADHD") or recorded any cognitive side effects from medication.[14]  They also provided no indication of Plaintiff's residual functional capacity or her limitations of daily living, other than the mention that Plaintiff lacked motivation and that

---

[9]     See Tr. 602-03, 670, 673, 972.

[10]     Tr. 972.

[11]     Diagnostic & Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n 4th ed. 2000)(replaced in 2013 by the fifth edition, which dropped GAF in favor of the World Health Organization Disability Assessment Schedule 2.0).

[12]     See Tr. 602-03, 670, 673, 972.

[13]     See id.

[14]     See id.

she was not going out of the house for certain periods.[15]

In March 2014, Plaintiff began receiving treatment through the Harris Health System for both medication management and psychotherapy.[16]   Cristin Aoshima-Kilroy, M.D., ("Dr. Aoshima-Kilroy") performed the initial psychiatric evaluation on March 4, 2014, and found Plaintiff's mental status examination to be within normal limits with "ok" mood and "full range—dysthymic" affect.[17] Dr. Aoshima-Kilroy expressed her concern with the number of psychotropic medications that Plaintiff was taking and her opinion that Plaintiff's self-reported cognitive blunting and headaches could be a result of the medications.[18]   The doctor discussed these points with Plaintiff, who said that she wanted to remain on all of the medications.[19]

Diagnosing Plaintiff with mood disorder, not otherwise specified, Dr. Aoshima-Kilroy stated, "I do not see enough evidence to agree with diagnosis of bipolar disorder.   Borderline personality disorder appears to be better suited diagnosis and will continue to monitor for this."[20]   Dr. Aoshima-Kilroy added cluster

---

[15]   See id.

[16]   See Tr. 955-64.

[17]   See Tr. 959-64.

[18]   See Tr. 961.

[19]   See id.

[20]   See Tr. 961.

B traits to Plaintiff's diagnosis, reflecting the opinion that Plaintiff could have a personality disorder.[21]

Over the course of the subsequent seventeen months, Plaintiff attended eleven medication management appointments with Dr. Aoshima-Kilroy, who consistently recorded that the mental status examinations were within normals limits with changes in mood that ranged in description from depressed to anxious to "better" to "accepting" and affect that mostly remained dysthymic.[22]   Dr. Aoshima-Kilroy continued the diagnosis of mood disorder and cluster B traits throughout treatment during the relevant time but added the diagnosis of anxiety disorder, not otherwise specified, in August 2014.[23]   A year later, she changed the mood disorder diagnosis to unspecified bipolar disorder and added neuro-cognitive disorder.[24]

Dr. Aoshima-Kilroy variously rated Plaintiff's GAF score as fifty-five or sixty, both reflecting moderate symptoms, throughout treatment.[25]   At various times, Plaintiff reported making jewelry, refinishing furnishing, having friends over to visit frequently, visiting a friend out of town, washing clothes and dishes, driving

---

[21]    See Tr. 929.

[22]    See Tr. 104-11, 814-21, 868-74, 886-92, 899-904, 927-33, 1037-38, 1054, 1059-68, 1074-75, 1161-62, 1168-76.

[23]    See Tr. 901, 929, 816, 868, 871, 888, 1162.

[24]    See Tr. 106.

[25]    See Tr. 106, 816, 870, 888, 901, 929, 961, 1162, 1171.

others around town, and attending support groups.[26]  Plaintiff reported memory difficulties more than once and, at one appointment, could not remember any of five objects until given a hint on one, after which she was able to name them all.[27]

In addition to medication management, Plaintiff received psychotherapy for anxiety and depression prior to the alleged onset date.[28]  The therapy sessions through Harris Health System were the only time-relevant psychotherapy in the record.  From March 2014 to August 2015, Plaintiff received psychotherapy more than thirty times.[29]  Although Plaintiff saw at least three therapists during that time, her mental status exam results were always within normal limits; her diagnosis remained mood disorder, not otherwise specified; and her GAF score remained at fifty-five.[30]

On occasion at non-psychiatric medical appointments, the treatment provider addressed Plaintiff's mental health.[31]  For example, on August 25, 2015, at an appointment for diabetes management, Plaintiff told the nurse practitioner that her mental

---

[26]    See Tr. 104, 868, 899, 927, 1168.

[27]    See Tr. 1162.

[28]    See Tr. 398.

[29]    See Tr. 808-13, 822-40, 850-67, 875-78, 893-98, 905-926, 934-58, 992-98, 1009-13, 1035-36, 1038, 1047, 1050, 1056-57, 1063-66, 1116-19, 1124-27, 1148-51, 1153-59.

[30]    See Tr. 810-11, 824-25, 830-31, 837-38, 852-53, 858, 864-65, 877-78, 895-96, 907-08, 912-13, 918-19, 925, 936-37, 942, 946-47, 951-52, 956, 994-95, 1009-10, 1117, 1125-26, 1149, 1154, 1156.

[31]    See, e.g., Tr. 785, 1120.

6

"fog" had resolved and the stressors in her life had minimized.[32] The practitioner recorded that Plaintiff's mood, affect, behavior, and thought content were all normal.[33]

In October 2015, two months after issuance of the ALJ's decision, Brittany Grabois Schuman, Psy.D., ("Dr. Schuman"), conducted an outpatient psychology evaluation.[34]  The evaluation included clinical and neuropsychiatric interviews; intelligence and cognitive functioning tests; personal, psychiatric, and neuropsychological assessments and inventories, and review of health records and a self-report questionnaire.[35]  Plaintiff's mood was depressed with congruent affect without suicidal or homicidal thoughts, intent, means, or any plan.[36]

In the evaluation summary, Dr. Schuman opined that Plaintiff experienced "mild difficulty with delayed memory for auditory tasks" but was "fully oriented," possessed intact "abilities for naming, visuospatial/constructional tasks, attention, and abstraction," tested in the high average range for nonverbal intelligence, and suffered "minor difficulties with language and

---

[32]     Tr. 1120.

[33]     See Tr. 1122.

[34]     Tr. 22-29, 38-46.  The evaluation was misdated as October 7, 2014. Compare Tr. 22, 39 with Tr. 50.

[35]     Tr. 22-29, 38-46, 50.

[36]     Tr. 50.

processing speed."[37]   The doctor further opined that the deficits in Plaintiff's ability to participate in activities of daily living were minor and her cognitive deficits were likely attributable to depression, not to a sharp decline in mental abilities.[38]   Dr. Schuman diagnosed Plaintiff with unspecified bipolar and related disorder and unspecified anxiety disorder and assessed Plaintiff a GAF score of fifty-five.[39]

### 2.  Diabetes

Plaintiff's diabetes diagnosis predated the alleged disability period but medication and disease management continued throughout the relevant time.[40]   The notes from multiple encounters stated that Plaintiff maintained seventy-five percent compliance with diabetes medication; however, her compliance with proper diet was recorded as anywhere from twenty-five to seventy-five percent.[41]   In those treatment notes, the providers often also indicated that Plaintiff's home blood tests generally reflected high glucose levels.[42]

Although Plaintiff had abnormal results on diabetes-related

---

[37]   Tr. 27-28, 44.

[38]   Tr. 28, 44.

[39]   Tr. 28, 44-45.

[40]   See, e.g., Tr. 38, 629-47, 791-98, 805, 1108-16, 1119-24, 1127-33, 1144-48.

[41]   See, e.g., Tr. 784, 791, 1111, 1130.

[42]   See, e.g., 784, 1111, 1130.

laboratory tests on more than one occasion, Plaintiff showed no other physical manifestations of unmanaged diabetes.[43]   More specifically, the treatment providers routinely recorded that Plaintiff had no numbness or tingling, no gait disturbance, no muscular weakness, and no impaired coordination/balance.[44] The only contrary notation in the record was Plaintiff's report at a psychiatric appointment in June 2015 that she had fallen a few times and was experiencing hand numbness.[45]   However, a podiatry appointment in July 2015 produced normal results with no report of falls or numbness.[46]   In August and September of 2015, Plaintiff reported walking for exercise four times a week.[47]

## B.  **Application to SSA**

On September 24, 2014, Plaintiff filed an application for disability insurance benefits,[48] claiming an inability to work since May 14, 2013, due to bipolar disorder, obsessive-compulsive disorder, anxiety, and depression.[49]   In a later disability report,

---

[43]     See, e.g., Tr. 630, 632-34, 636-37, 785, 791, 800, 842-43, 1111, 1113, 1120, 1122, 1129, 1132, 1144-48.

[44]     See, e.g., Tr. 630, 637, 785, 842-43, 1111, 1120, 1145.

[45]     See Tr. 1169.

[46]     See Tr. 1146.

[47]     See Tr. 1111, 1129.

[48]     The record also contains an application for supplemental security income under Title XVI of the Act, but Plaintiff and the ALJ only mention the Title II application.  See Tr. 206, 352-56; Doc. 10, Pl.'s Mot. for Summ. J. & Resp. to Def.'s Brief p. 3.

[49]     See Tr. 357-63, 392, 1111.

Plaintiff added diabetes to the list of disabling conditions and omitted obsessive-compulsive disorder.[50]

In November 2013, Plaintiff underwent two consultative examinations.[51]   During the psychological evaluation, Plaintiff exhibited a dysphoric mood at times and a euthymic mood at times.[52] The contents of her thoughts, her orientation, her ability to perform calculations were normal, but she exhibited difficulty with certain memory assessments.[53]   The psychologist opined that Plaintiff's social life was stable and that she was able to manage her money, was independent with all personal hygiene and self care, and was able to drive.[54]   Based on Plaintiff's self-reports during the interview, the psychologist diagnosed Plaintiff with bipolar disorder and hoarding disorder and found her prognosis to be fair with psychotherapy, medication compliance, and anxiety-management education.[55]

At the medical examination, Plaintiff reported that she was experiencing numbness and tingling in her toes and hands and that

---

[50]    See Tr. 413.

[51]    See Tr. 614-19, 621-28.

[52]    See Tr. 624.

[53]    See id.

[54]    See Tr. 625.

[55]    See id.

she felt the sensation of burning in her left great toe.[56]
Plaintiff also told the doctor that she walked one mile at a time.[57]
The doctor observed Plaintiff's gait to be normal and her ability
to walk on her toes and heels to be normal.[58]  The doctor diagnosed
Plaintiff with diabetes with peripheral neuropathy, as well as
restless leg syndrome, bipolar disorder, and incontinence and
assessed her prognosis to be "very good."[59]

On December 20, 2013, the SSA found Plaintiff not disabled at
the initial level of review.[60]  On April 11, 2014, the SSA again
found Plaintiff not disabled upon reconsideration.[61]

In October 2014, Dr. Fallick completed a mental residual
functional capacity ("RFC") evaluation on Plaintiff's behalf.[62]  He
listed mood disorder, not otherwise specified, and ADHD,
predominantly inattentive subtype, as Plaintiff's psychiatric
diagnoses and assessed her prognosis to be guarded.[63]  With regard
to Plaintiff's response to treatment, Dr. Fallick stated that it

----

[56]    See Tr. 614, 616.  This report is not completely legible.  See Tr.
614-19.

[57]    See Tr. 615.

[58]    See Tr. 616, 617.

[59]    Tr. 618.

[60]    See Tr. 275-85, 300-04.

[61]    See Tr. 287-99, 307-11.

[62]    See Tr. 966-70.

[63]    See Tr. 966.

varied but that Plaintiff "continuously struggle[d] with distract[i]bility and motivation."[64]   Regarding side effects, the doctor stated vaguely that "Topamax[65] may cause cognitive dulling."[66]

Dr. Fallick's RFC assessment rated Plaintiff as "[u]nable to meet competitive standards" on nine mental abilities and aptitudes necessary for the performance of unskilled work: (1) "[m]aintain attention for two[-]hour segment;" (2) "[s]ustain an ordinary routine without special supervision;" (3) "[w]ork in coordination with or proximity to others without being unduly distracted;" (4) "[p]erform at a consistent pace without an unreasonable number and length of rest periods;" (5) "[r]espond appropriately to changes in a routine work setting;" (6) "[d]eal with normal work stress;" (7) "[u]nderstand and remember detailed instructions;" (8) "[c]arry out detailed instructions;" and (9) "[d]eal with stress of semiskilled and skilled work."[67]

He opined that Plaintiff was seriously limited but not precluded on six mental abilities and aptitudes.[68]  Of the remaining ten mental abilities and aptitudes listed on the form, Dr. Fallick

---

[64]    Id.

[65]    Topamax is an anticonvulsant drug used to treat migraine headaches as well as epilepsy.  See Topamax, WebMD (July 2017), www.webmd.com/drugs/2/drug-14494-6019/topamax-oral/topiramate-oral/details.

[66]    See Tr. 966.

[67]    Tr. 968-69.

[68]    See id.

12

answered five, finding Plaintiff limited but satisfactory in those areas, and left five blank.[69]   According to Dr. Fallick's projection, Plaintiff would be absent from work more than four days a month due to her impairments or treatment.[70]

Plaintiff requested a hearing before an ALJ.[71]   The ALJ granted Plaintiff's request and scheduled the hearing on June 11, 2015.[72]

## C.   Hearing

At the hearing, Plaintiff, two medical experts, and a vocational expert testified.[73]   Under questioning by the ALJ, Plaintiff confirmed her age and described her past relevant work as a court reporter.[74]   Plaintiff answered questions by her attorney about her psychiatric history.[75]   Plaintiff stated that Dr. Fallick had been her psychiatrist since 2000.[76]   She said that she was hospitalized in 2005 because she was suicidal but had not received inpatient treatment since then.[77]   She also reported a history of

---

[69]     See id.

[70]     See Tr. 970.

[71]     See Tr. 317-18.

[72]     See Tr. 319-22.

[73]     See Tr. 232-74.

[74]     See Tr. 237-38.

[75]     See Tr. 238-40.

[76]     See Tr. 238-39.

[77]     See Tr. 239-40.

alcohol and drug dependence but became sober in 1990.[78]  Plaintiff described in detail how much difficulty she had meeting the demands of her job in 2010 due to lack of concentration and distractibility and explained that this poor performance ultimately led to her termination in May 2013.[79]  A month later, Plaintiff began to receive insurance payments for long-term disability.[80]

Relevant to her condition since her termination, which coincides to the day with her alleged onset date, Plaintiff reported that she was unable to concentrate, heard voices saying her name, saw nonexistent people running in halls of her house, and compulsively hoarded[81] furniture.[82]  Plaintiff said that she did not sleep much at night but slept a lot during the day, staying in bed most of the time.[83]  Plaintiff described a "bad day," which she said occurred one or two days a week, as including her skin crawling, her head hurting, and her body shaking.[84]  At the time of the hearing, Plaintiff said, she was taking "seven types of psych

---

[78]     See Tr. 239.

[79]     See Tr. 241-44.

[80]     See Tr. 245.

[81]     At the hearing, the psychiatric expert explained that a hoarding disorder "is sort of a subcomponent of an obsessive-compulsive disorder, but it falls under the anxiety disorder." Tr. 260.  In response to a question from the ALJ, the expert stated that a hoarding disorder generally "is not reflected in the working environment." Tr. 261.

[82]     See Tr. 244-51.

[83]     See Tr. 248.

[84]     Tr. 252.

meds."[85]

Plaintiff's attorney asked about diabetes, with which, Plaintiff testified, she had been diagnosed in 1998.[86]  Plaintiff reported, that as a result of diabetes, she recently had begun experiencing tingling in her hands and numbness in her toes.[87]  Plaintiff reported being able to drive, to watch television shows on her computer, to attend Narcotics Anonymous meetings, to grocery shop, and to care for three dogs but being unable to read or to date.[88]

Ashok Khushalani, M.D., ("Dr. Khushalani"), a psychiatric expert, testified next and provided an overview of Plaintiff's mental-health treatment based on his review of Plaintiff's medical records.[89]  In particular, he pointed out that Plaintiff described Abilify as changing her life.[90]  Dr. Khushalani noted a discrepancy between Dr. Fallick's RFC assessment in October 2014 indicating Plaintiff had several significant limitations and one of his treatment notes in January 2015 stating that Plaintiff was "well."[91]  Further addressing contradictions between Dr. Fallick's RFC

---

[85]     Tr. 239, 253.

[86]     See Tr. 255-56.

[87]     See Tr. 256.

[88]     See Tr. 246, 251-52, 254.

[89]     See Tr. 258-59.

[90]     See Tr. 258.

[91]     See Tr. 259.

assessment and his treatment notes, Dr. Khushalani stated that Dr. Fallick rated Plaintiff as having marked limitations but had rated her as sixty on the GAF scale, which, he said, was considered comparable to moderate to marked limitations.[92]

Dr. Khushalani opined that Plaintiff did not meet or equal any of the mental disorders described in the listings of the regulations[93] (the "Listings").  In Dr. Khushalani's opinion, Plaintiff was "reasonably stable" with mild restrictions on activities of daily living, moderate restrictions in maintaining social functioning and following detailed and complex instructions.[94]  Finding no evidence of any restriction in attention span, concentration, and pace for simple tasks, Dr. Khushalani found Plaintiff capable of completing simple tasks with only occasional public contact.[95]

Turning to Plaintiff's physical ailments, the ALJ questioned Albert Oguejiofor, M.D., ("Dr. Oguejiofor"), who identified diabetes as a medically determinable impairment.[96]  Dr. Oguejiofor stated, "[W]e have . . . diabetes with no evidence for listing level in organ complication of diabetes.  What we're looking at is

---

[92]    See Tr. 262.

[93]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[94]    Tr. 259; see also Tr. 160.

[95]    See Tr. 260.

[96]    Tr. 263.

16

peripheral neuropathy with muscle atrophy, loss of power and positions resulting in an inability to ambulate effectively, due to listing 11.14 [peripheral neuropathy] and 11.04 [vascular insult to the brain]."[97]   He also listed skin sarcoidosis as a nonsevere impairment.[98]  Dr. Oguejiofor opined that Plaintiff was capable of work that was light in exertional demand.[99]

The doctor explained that the usual side effects from the medical and psychotropic medications Plaintiff was taking would not prohibit light work unless she was experiencing severe side effects, which was not reflected in the record.[100]  On this topic, Dr. Khushalani expressed his opinion that her regimen included too many medications, stating, "Fortunately, most of the medications she is getting have very few side effects and very little sedation, so I believe she's lucky, but I don't know that she needs all those medicines."[101]   When asked, he explained that generally those medications did not cause sedation, forgetfulness, or loss of concentration and noted that the medical record did not reflect that Plaintiff had reported experiencing side effects from the

---

[97]    Id.

[98]    Tr. 263-64.  According to Dr. Oguejiofor, the diagnosis of skin sarcoidosis , which is autoimmune in nature, resulted in a nonsevere impairment because Plaintiff's pulmonary function tests were normal.  See Tr. 264.

[99]    See id.

[100]    See Tr. 265.

[101]    Tr. 266.

medications.[102]

The vocational expert, Kassandra Humphress ("Humphress") took the stand to discuss Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform that work or any other job.[103]  Humphress classified Plaintiff's job of court reporter as sedentary in exertional demand and skilled.[104]

The ALJ asked whether the following hypothetical individual would be able to perform that work:

> Assume a hypothetical individual the claimant's age and educational background, ability to perform exertional demands of light work as defined in the commissioner's re[gu]lations.  Assume the individual can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds; stand and walk about six hours out of an eight-hour workday with normal breaks, s[i]t for about six hours out of an eight-hour workday with normal breaks.  The individual can understand, remember, and carry out short and simple instructions, maintain attention and concentration for extended periods on simple tasks.  The individual is limited to simple, routine, repetitive tasks.  The individual is limited to superficial interaction with the general public, occasional interaction with coworkers, and occasional interaction with supervisors.[105]

Humpress answered that the individual would not be able to work as a court reporter but that she could work as a shredder, a laundry sorter, or a garment sorter.[106]  When the ALJ posed additional

---

[102]     See Tr. 266-68.

[103]     See Tr. 269-72.

[104]     See Tr. 269.

[105]     Id.

[106]     See Tr. 270.

18

hypothetical facts, the vocational expert stated that neither an individual who was off task for more than twenty percent of the workday nor one who would be absent from work about three days a month would be able to perform the cited jobs.[107]

Plaintiff's attorney asked if the hypothetical individual could perform those jobs if she was limited to a climate-controlled environment, and Humphress said that the individual could.[108]  The attorney then asked whether any of the following limitations would make a difference: (1) the inability to work in coordination with or in proximity to others without becoming unduly distracted; (2) the need for prompting twice per hour; (3) the inability to respond appropriately to changes in the work setting; (4) the inability to deal with normal work stress; or (5) the need to be absent four days a month.[109]  Humphress answered that any of those limitations on its own would prevent employment.[110]

**D.   Commissioner's Decision**

On August 7, 2015, the ALJ issued an unfavorable decision.[111] The ALJ found that Plaintiff had not engaged in substantial gainful

---

[107]   See Tr. 270-71.

[108]   See Tr. 271.

[109]   See Tr. 271-73.

[110]   See id.

[111]   See Tr. 206-20.

activity since May 14, 2013, the alleged onset date.[112]   The ALJ
recognized the following impairments as severe: "bipolar disorder,
hoarding disorder, history of polysubstance abuse, [ADHD], mood
disorder, and diabetes mellitus."[113]   However, he found sarcoidosis
to be a nonsevere impairment.[114]   At the Listing step, the ALJ found
that Plaintiff did not meet the requirements of any Listing,
addressing the category of Endocrine Disorders generally and then,
more specifically, Listings 12.04 (Affective Disorders), 12.06
(Anxiety and Obsessive-Compulsive Disorders), and 12.09 (Substance
Addiction Disorders).[115]

　　　The ALJ thoroughly discussed Plaintiff's medical treatment for
her impairments, including Dr. Fallick's treatment notes, those
concerning diabetes, and Plaintiff's own reports and testimony.[116]
He also discussed the consultative psychological and physical
examinations, an initial psychiatric evaluation upon transferring
treatment providers in March 2014, Dr. Fallick's RFC assessment,
and the opinions of the medical experts and the state-agency
consultants.[117]   The ALJ stated:

---

[112]　　See Tr. 208.

[113]　　See id. (emphasis omitted).

[114]　　See id.

[115]　　See Tr. 209-10.

[116]　　See Tr. 211-18.

[117]　　See Tr. 212-18.

> The claimant has a history of mental problems and diabetes. However, the objective evidence of record shows that the claimant's impairments are adequately controlled on medications and impose[] no more than mild to moderate limitations on her ability to perform work-related activities.[118]

The ALJ noted two inconsistencies in the record with regard to Plaintiff's psychiatric diagnoses: (1) Although Dr. Fallick indicated that Plaintiff carried a diagnosis of ADHD, his treatment notes did not include that diagnosis; and (2) Plaintiff represented that she was diagnosed with bipolar disorder, but one provider disagreed with the diagnosis and another listed it as a diagnosis based primarily on Plaintiff's subjective report.[119]

Specifically with regard to Dr. Fallick's RFC assessment, the ALJ stated:

> Dr. Fallick's treatment notes do not support the opinion that the claimant would be so limited as opined in the mental RFC. January 2014 treatment notes with Dr. Fallick indicated the claimant had only "mild" depression. She was given a GAF score of 60 during that January 2014 visit, which remained unchanged in the RFC [by Dr. Fallick]. A GAF score of 60 is not consistent with marked limitations, such that an individual would be unable to meet competitive standards maintaining attention for two[-]hour segments, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, performing at a consistent pace without an unreasonable number and length of rest periods, and responding appropriately to changes in a routine work setting.[120]

---

[118]   See Tr. 211.

[119]   See Tr. 216.

[120]   Id. (internal citations omitted).

21

On other occasions, the ALJ noted, Dr. Fallick recorded that Plaintiff was doing "fairly well" and assessed Plaintiff a GAF score of sixty or higher, concluding that "Dr. Fallick's own treatment notes undermine his mental RFC, as they demonstrate a history of stability on medications and mental functioning that has been only mildly to moderately impaired."[121]

The ALJ concluded that Dr. Fallick's opinion "regarding the nature and severity of the claimant's mental conditions" was entitled to little weight because it was "not well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] inconsistent with the other substantial evidence in the case record."[122]  On the other hand, the ALJ accorded the testifying medical experts' opinions substantial weight because they were the only doctors who reviewed the entire record, observed Plaintiff, and offered opinions that were supported by a preponderance of record evidence.[123]  The ALJ also gave some weight to the state agency consultants who reviewed Plaintiff's application at the initial and reconsideration levels, stating that their opinions were "generally consistent with the medical evidence of record."[124]

---

[121]   Tr. 216-17.

[122]   Tr. 216.  The ALJ also cited legal authority stating that the disability decision was reserved to the Commissioner rather than any medical source.  See id.

[123]   See Tr. 217.

[124]   Tr. 218.

The ALJ found Plaintiff capable of light work limited to "understanding, remembering, and carrying out short and simple instructions" and to performing simple, routine, and repetitive tasks.[125]   He found her capable of maintaining attention and concentration for extended periods on simple tasks and capable of "superficial interaction with the general public and occasional contact with coworkers and supervisors."[126]   Relying on the vocational expert's response to a hypothetical that contained the same limitations as the ALJ's RFC assessment, the ALJ found Plaintiff unable to perform her past relevant work but able to perform the jobs of shredder, laundry sorter, and garment sorter.[127]   Therefore, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date to the date of the ALJ's decision.[128]

On October 6, 2015, Plaintiff appealed the ALJ's decision.[129]   On November 30, 2016, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[130]   After receiving the

---

[125]    Tr. 210.

[126]    Id.

[127]    See Tr. 218-19.

[128]    See Tr. 219.

[129]    See Tr. 35-36.

[130]    See Tr. 1-4.

Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[131]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any

---

[131]    See Tr. 3; Doc. 1, Pl.'s Orig. Compl.

"substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

25

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) failure to properly weigh the medical opinions; and (2) failure to properly assess limitations due to diabetes.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.  Failure to Properly Weigh Medical Opinions

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  See 20 C.F.R. § 404.1527(c).  Generally, the ALJ will give more weight to medical sources who treated the claimant because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a

26

unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2); see also Greenspan, 38 F.3d at 237 (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); SSR 96-5p, 1996 WL 374183, at *2.

The ALJ is required to give good reasons for the weight given a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *5.

> When the determination or decision . . . is a denial[,] . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record, it is to be given controlling weight. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment

27

relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization.  20 C.F.R. § 404.1527(c)(2).  However, the ALJ is only required to consider these factors in deciding what weight to give a medical source opinion; he is not required to record in writing every step of the process.  20 C.F.R. § 404.1527(c)("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we give to any medical opinion.")(emphasis added).

Plaintiff takes issue with the ALJ's assignment of more weight to the RFC opinion of Dr. Khushalani than that of Dr. Fallick, arguing that the ALJ "relied on the non-examining medical expert over . . . the acknowledged treating physician."[132]  Of course, giving more weight to a medical expert over a treating physician is not an error; in fact, it is the ALJ's decision to make.  See Greenspan, 38 F.3d at 237 (internal quotation marks omitted)(quoting Scott, 770 F.2d at 485)("In sum, the ALJ is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.").  In deciding, the ALJ must consider all medical opinions in the record, must explain the weight given each, and, when not according controlling weight to a treating physician, must evaluate the

---

[132]    Doc. 10, Pl.'s Mot. for Summ. J. & Resp. to Def.'s Brief p. 6.

treating physician's opinion in light of the treatment relationship, medical evidence in support, and consistency.

Here, the ALJ discussed the medical opinions of both Drs. Khushalani and Fallick and explained the weight given to each. With regard to Dr. Khushalani, the ALJ determined that his opinion was entitled to substantial weight because he reviewed the entire record, observed Plaintiff, and offered opinions that were supported by a preponderance of record evidence. In contrast, the ALJ determined that Dr. Fallick's opinion regarding the nature and severity of Plaintiff's mental impairments was entitled to little weight because it was "not well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] inconsistent with the other substantial evidence in the case record."[133]   The ALJ did not stop with that generalized statement but, rather, pointed in particular to two aspects of Dr. Fallick's RFC opinion that the ALJ found were not supported Dr. Fallick's treatment notes.[134]

First, the ALJ noted that the diagnosis of ADHD listed in the RFC assessment was inconsistent with the treatment notes from the

---

[133]   Tr. 216.

[134]   The ALJ also pointed out that decisions on such issues as whether the claimant is disabled or unable to work are reserved to the Commissioner.  See Tr. 216.  The ALJ was not required to give any weight to Dr. Fallick's opinion on these issues.  See Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003)(stating that the determination of disability is not a medical opinion entitled to deference, but a legal conclusion within the Commissioner's scope of authority).

relevant time.[135]   The only psychiatric diagnosis recorded in Dr. Fallick's notes during Plaintiff's alleged disability period was mood disorder, not otherwise specified.[136]   Second, the ALJ found the degree of limitation reflected in the RFC assessment was not supported by the consistent, treatment-time GAF assessment of sixty, a score at the highest functioning end of moderate symptoms. The ALJ explained that a GAF score of sixty was indicative of only moderate symptomology, not an inability to meet competitive standards.

The court finds the reasons offered by ALJ for giving less weight to Dr. Fallick's RFC opinion to be well reasoned.   It is indisputable that Plaintiff did not carry a diagnosis of ADHD during the relevant period.   Moreover, Dr. Fallick's notes were brief and focused on the medication adjustments with very little information about Plaintiff's RFC or activities of daily living. Based solely on the treatment notes, it would be impossible to reach the conclusion, as did Dr. Fallick, that Plaintiff was unable to meet competitive standards with regard to the identified nine

---

[135]   Although Plaintiff saw Dr. Fallick every few months for many years concluding in January 2015, she only had four appointments between the alleged onset date of May 14, 2013, and the date of the RFC assessment on October 6, 2014, and only one more before changing providers.   See Tr. 602-03, 670, 673, 972.

[136]   Plaintiff argues that the ALJ's inclusion of ADHD as a severe impairment undermines his list of inconsistencies between Dr. Fallick's RFC opinion and the rest of the record.   Albeit an interesting argument, the court disagrees.   The question raised by Plaintiff really is whether substantial evidence supports the ALJ's decision to include ADHD and bipolar disorder as severe impairments.   That looks to be a rather close call.

mental abilities and aptitudes or that Plaintiff was seriously limited with regard to six others. Although his statement that Plaintiff struggled with distractibility and motivation is supported by a few treatment notations, the degree of limitation in his RFC has absolutely no clinical support in his records. Additionally, two other physicians expressed concern that Plaintiff was over-medicated during treatment with Dr. Fallick, a basis not cited by the ALJ but arguably a relevant factor in deciding what weight to grant his opinion.

The ALJ's decision cited 20 C.F.R. § 404.1527 and several Social Security Rulings, stating that the ALJ considered opinion evidence in accordance with the requirements therein.[137] The court has no reason to doubt the ALJ, and, as discussed above, he is not required to discuss in his decision all of the factors outlined in the regulations when giving a treating physician's opinion some weight but less than controlling weight.[138] See 20 C.F.R. § 404.1527(c).

Plaintiff also contends that, in addition to the limitations identified in Dr. Fallick's RFC opinion, Plaintiff's termination

---

[137]    See Tr. 211.

[138]    The court finds it prudent to address one other argument by footnote. Plaintiff argues that her hospitalization in 2005 serves as evidence of decompensation and that the diagnoses she carried at that time explain Dr. Fallick's inclusion of ADHD in his RFC assessment. This is nonsense. Plaintiff's condition eight years prior to her alleged onset date, while she was still working, has no bearing on the disability analysis for the period May 14, 2013, to August 7, 2015. Obviously, Dr. Fallick's RFC assessment is pertinent only if he was addressing Plaintiff's condition in October 2014 when he completed it.

from her past relevant work "so strongly indicate[s]" that her mental impairments would prevent her from being able to sustain employment.[139]  Having already addressed the limited value of Dr. Fallick's RFC opinion, the court finds Plaintiff's termination irrelevant.  The ALJ agreed that Plaintiff could not perform her past relevant work.  The ALJ's RFC determination included limitations that, according to the vocational expert, would prevent Plaintiff from returning to court reporting.  Therefore, her termination and the reasons for it provide no insight into Plaintiff's ability to sustain employment in the unskilled jobs identified by the vocational expert.

Moreover, this is not a case where the ALJ needed to articulate a specific finding that Plaintiff could maintain the cited jobs.  See Perez v. Barnhart, 415 F.3d 457, 465 (5th Cir. 2005)(quoting Frank, 326 F.3d at 619)(stating that the "ability to maintain employment is subsumed in the RFC determination" unless the claimant makes a showing that her ailment waxes and wanes).  In this case, the ALJ did not find Dr. Fallick's opinion that Plaintiff would miss four or more days a month to be supported and did not include it in his RFC determination.

The court also finds the opinion that Plaintiff would miss more than four days of work per month unsupported.  Plaintiff's appointments with Dr. Fallick were every few months, at which time

_____

[139]   Doc. 10, Pl.'s Mot. for Summ. J. & Resp. to Def.'s Brief p. 8.

he made minor adjustments to her medication. Plaintiff also attended psychotherapy approximately twice a month. These appointments did not require a full day off of work even if they could not be scheduled outside of work hours. Nothing in the record suggested that a more intensive treatment plan was necessary to treat Plaintiff's mental disorders or that they could cause Plaintiff to be absent from work once a week or more.

The ALJ complied with all SSA requirements and cited substantial evidence to support his conclusion that Dr. Fallick's opinion was entitled to little weight.

## B.  **Failure to Properly Assess Limitations Due to Diabetes**

A claimant's RFC is her utmost remaining ability to work despite all of her limitations resulting from her impairment. See Villa v. Sullivan, 895 F.2d 1019, 1023 (5th Cir. 1990); 20 C.F.R. § 404.1545(a)(1). In evaluating the claimant's RFC, the ALJ is directed by the regulations to consider how the claimant's impairment affects her physical, mental, and other abilities, as well as the total limiting effects of her impairment. See 20 C.F.R. § 404.1545. The mere mention of a condition in the medical records does not establish a disabling impairment or even a significant impact on that individual's functional capacity. Cf. Johnson v. Sullivan, 894 F.2d 683, 685 (5th Cir. 1990)(referring to a diagnosis as only part of the evidence that must be considered). The testimony of a medical expert, as long as it does not

contradict the findings of an examining physician, is substantial evidence in support of the ALJ's RFC determination. See Villa, 895 F.2d at 1024.

The regulations provide that the ultimate responsibility for determining RFC lies with the ALJ.  20 C.F.R. § 404.1527(d)(2); see also Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).  After arriving at an RFC that takes "into account all the restrictions reasonably warranted by the evidence," an ALJ may rely on the response of a vocational expert to a hypothetical question on job availability as it relates to a person with the claimant's limitations.  Dominque v. Barnhart, 388 F.3d 462, 463 (5th Cir. 2004).  In order to serve as substantial evidence, the vocational expert's testimony must be based on a hypothetical question that incorporates all of the limitations recognized by the ALJ and must be subject to the claimant's cross-examination.  See Masterson v. Barnhart, 309 F.3d 267, 273-74 (5th Cir. 2002)(citing Boyd v. Apfel, 239 F.3d 698, 707 (5th Cir. 2001).

Plaintiff argues that the ALJ failed to consider numbness in the toes and tingling in the hands in reaching his RFC determination and that, had he, he would have included additional walking and handling limitations in Plaintiff's RFC.  She also contends that the ALJ improperly relied on Dr. Oguejiofor's hearing testimony that the record contained "no evidence of neuropathy or

difficulty with ambulation."[140]

Taking the second issue first, the ALJ interpreted Dr. Oguejiofor's testimony to mean that the record included no evidence of neuropathy or difficulty with ambulation. However, their colloquy was not so straight forward. Dr. Oguejiofor appeared to be saying that Plaintiff's diabetes did not meet Listings 11.14 and 11.04 because Plaintiff did not meet the requirements of "peripheral neuropathy with muscle atrophy, loss of power and positions resulting in an inability to ambulate effectively."[141] The court cannot determine whether the ALJ read more into Dr. Oguejiofor's testimony by taking it to mean that the record contained no evidence of neuropathy or difficulty with ambulation.

Regardless, the record contains substantial evidence to support the ALJ's exclusion of additional walking and handling limitations based on numbness and tingling. Plaintiff cites three pages in the administrative record as "multiple diagnosis [sic] of peripheral neuropathy."[142] Two of these were appointment records from June 23, 2011, and April 19, 2012, both well before the alleged onset of disability. Each of these records merely listed diabetes "with neurological manifestations" as one of Plaintiff's

---

[140]   Doc. 10, Pl.'s Mot. for Summ. J. & Resp. to Def.'s Brief p. 11 (quoting Tr. 217).

[141]   Tr. 263.

[142]   Doc. 10, Pl.'s Mot. for Summ. J. & Resp. to Def.'s Brief p. 11 (citing Tr. 541, 571, 614).

diagnoses without any indication that Plaintiff was functionally limited in any way.[143]   The other record cited was a consultative examination, not a treatment record.   At the consultative examination, Plaintiff reported numbness and tingling in the toes and hands and a burning sensation in her left great toe, but she also reported that she walked one mile at a time.

The fact is that many treatment records from the relevant period routinely noted that Plaintiff had no numbness or tingling, no gait disturbance, no muscular weakness, and no impaired coordination/balance.   The only exception was Plaintiff's disclosure that she was experiencing hand numbness, which she made to her psychiatrist in June 2015.   At that meeting she also reported having fallen.   That same month, Plaintiff testified at the administrative hearing that she recently had begun experiencing tingling in her hands and numbness in her toes.   However, at a July 2015 podiatry appointment, Plaintiff reported no numbness, and the examination produced normal results.   In August and September of 2015, Plaintiff reported walking for exercise four times a week.

The number of examinations during the relevant period that noted no neuropathy and no difficulty ambulating overwhelm the few occasions on which Plaintiff reported neuropathic symptoms and falls.   More importantly, the record contains no evidence of functional limitations resulting from numbness and tingling, not

---

[143]    Tr. 541, 571.

even her own testimony.  To the contrary, Plaintiff's ability to walk long distances undermines her assertion that the RFC should have included walking limitations.  Even if Plaintiff suffered limitations as a result of periodic numbness and tingling, they were concentrated in November 2013 and June 2015, not ongoing limitations.

Even without Dr. Oguejiofor's testimony, substantial evidence supports the ALJ's decision not to include walking and handling limitations in the RFC determination.  Because the hypothetical question presented to the vocational expert included all limitations reasonably supported by the record, the ALJ did not err by relying on the testimony that Plaintiff could perform the jobs of shredder, laundry sorter, and garment sorter.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the

37

United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 26<u>th</u> day of January, 2018.

_____
U.S. MAGISTRATE JUDGE